This opinion is uncorrected and subject to revision before publication in the New York Reports.
--------------------------------------------------------------------

No. 151
In the Matter of Sierra Club, et al.,
            Appellants,
        v.
Village of Painted Post, et al.,
            Respondents.

            Richard Lippes, for appellants.
            Joseph D. Picciotti, for respondents.
            Railroads of New York; Gas Free Seneca et al.; New York State Conference of Mayors and Municipal Officials, amici curiae.

ABDUS-SALAAM, J.:

        In Society of Plastics Indus. v County of Suffolk (77 NY2d 761 [1991]), this Court examined the law of standing, and set forth a framework for deciding whether parties have standing to challenge governmental action in land use matters generally, and under the State Environmental Quality Review Act (ECL art 8 [SEQRA]), specifically. We held that "the plaintiff, for standing purposes, must show that it would suffer direct harm, injury that is in some way different from that of the public at large" (id. at 774). This appeal gives us the opportunity to

- 1 -

elucidate and further address the "special injury" requirement of standing (id. at 778) .

                                    I.

        The Village of Painted Post (the Village), in Steuben County, New York, is located at the confluence of the Cohocton, Tioga and Chemung Rivers.  Underlying the confluence of these rivers is the Corning aquifer, which is the principal drinking water supply of several municipalities, including the Village. In February 2012, the Board of Trustees of the Village adopted a resolution to enter into a bulk water sale agreement with respondent SWEPI, LP, a subsidiary of Shell Oil Co., which operates gas wells in Tioga County, Pennsylvania.  The bulk water sales agreement provided for the sale to SWEPI, LP of 314 million gallons of water in increments of up to 1 million gallons per day from the village water system with an option to increase the amount by an additional 500,000 gallons per day.

        The Village determined that, pursuant to 6 NYCRR 617.5(c)(25),[1] the sale of its water was a Type II action exempt from review under SEQRA.  Another resolution approved a lease agreement with respondent Wellsboro & Corning Railroad (Wellsboro) for the construction of a water transloading facility

---

        [1] 6 NYCRR 617.5 (c)(25) provides that actions for the "purchase or sale of furnishings, equipment or supplies, including surplus government property, other than the following: land, radioactive material, pesticides, herbicides, or other hazardous materials" are Type II actions that are not subject to review under SEQRA.

on 11.8 acres of land, previously used for industrial purposes, to be used as a filling station upon which the water would be withdrawn, loaded, and transported via rail line to Wellsboro, Pennsylvania.  The Village determined that the lease agreement was a Type I action under SEQRA[2] and issued a negative declaration, concluding that the lease will not result in any potentially significant adverse impact on the environment based on a review of a Full Environmental Assessment Form (EAF), a report prepared by engineering consultants to the Village, the site plan prepared for the railroad, and the 2005 deed to the site.

Construction of the water loading facility began in April 2012, and in June 2012, petitioners commenced this CPLR article 78 proceeding against the Village; Painted Post Development, LLC; SWEPI, LLC; and Wellsboro seeking an order (1) annulling the Village's Type II determination for the water sale agreement; (2) annulling the Village's negative declaration for the lease of the rail loading facility; (3) annulling the Village's water sale agreement with SWEPI and the lease to

_____

[2] 6 NYCRR 617.4 sets forth a non-exhaustive list of Type I actions and provides that "the fact that an action or project has been listed as a Type I action carries with it the presumption that it is likely to have a significant adverse impact on the environment and may require an [Environmental Impact Statement]. For all individual actions which are Type I or Unlisted, the determination of significance must be made by comparing the impacts which may be reasonably expected to result from the proposed action with the criteria listed in section 617.7 (c) of this Part."

Wellsboro; (4) requiring the Village to issue a Positive Declaration and complete an Environmental Impact Statement (EIS) for the totality of the plan rather than segmenting the water sale and the lease; (5) enjoining the Village from entering into the water sale and lease agreements until the Village complied with all federal and state laws; and (6) preliminarily enjoining any water shipments or work at the rail loading facility site until the Village complied with all federal and state laws. Petitioners included the not-for-profit organizations The Sierra Club, People for a Healthy Environment, Inc., and Coalition to Protect New York, as well as various individual residents of the Village.

As relevant here, petitioners asserted that the Village failed to comply with the strict procedural mandates of SEQRA, particularly that it (1) failed to consider significant adverse environmental impacts of the water withdrawals, (2) improperly claimed a Type II Exemption for the water sale agreement, and (3) impermissibly segmented its review of the water sale agreement and the lease agreement. With respect to petitioner John Marvin (appellant here), the petition alleged that he is a longtime resident of the Village and resides "less than a block from the proposed rail loading facility, which is visible from his doorstep" and that he and his wife would be "adversely affected by the significant rail traffic and increased noise and air contamination caused by the project." Respondents answered and

subsequently moved to dismiss the petition pursuant to CPLR 3211 (a) (3) and (7), asserting that petitioners lacked standing and failed to state a cause of action, and alternatively, moved for summary judgment pursuant to CPLR 3212.  Petitioners opposed the motions, submitting, among other things, an affidavit of petitioner Marvin,[3] who stated that when the water trains began running, he "heard train noises frequently, sometimes every night" and that the "[t]he noise was so loud it woke [him] up and kept [him] awake repeatedly."  Marvin further stated that the "noise was much louder than the noise from other trains that run through the [V]illage" and he was concerned that the "increased train noise will adversely impact [his] quality of life and home value."

Supreme Court searched the record and, in pertinent part, (1) granted summary judgment to petitioners insofar as it annulled (a) the Village's resolutions designating the surplus water agreement as a Type II action, (b) the negative declaration as to the lease agreement, and (c) the Village Board's resolutions approving the surplus water agreement and the lease agreement; (2) granted petitioners an injunction enjoining further water withdrawals pursuant to the surplus water agreement

---

[3]While the petition alleged that Marvin lives less than a block from the rail loading facility, he clarified in his affidavit that he lives one-half block from the railroad line that crosses his street, and a block and one-half from the rail loading facility.

pending the Village's compliance with SEQRA; and (3) denied respondents' motion to dismiss for lack of standing.  With respect to the standing of the organizations and individual petitioners, the court determined that none of the individual petitioners claimed that they were members of those organizations, that the organizations alleged only generalized environmental injuries that the public at large would suffer and that such generalized claims were insufficient to confer standing.

With respect to the individual petitioners, excepting Marvin, the court determined that they too alleged only general harm (i.e. disrupted traffic patterns, noise levels, and water quality) "no different than that experienced by the general public."  However, regarding petitioner Marvin, the court noted that he could see the water loading facility from his front porch, and concluded that Marvin's allegation of "train noise newly introduced into his neighborhood . . . is different than the noise suffered by the public in general."  The court reasoned that although Marvin did not "distinguish this noise from that of the previous train noises associated with the existing rail line or from the former industrial use of the area, nevertheless,

> "Marvin's undifferentiated complaint of train
> noise, however, may be considered in the
> context of an industrial and rail facility
> which fell into disuse for a considerable
> period of time prior to construction of the
> subject project, and thus his complaint of
> rail noise is availing to show harm distinct
> from that suffered by the general public."

Because Marvin had standing, the court did not dismiss the proceeding brought by the other petitioners who did not have standing.  On the merits of the petition, the court held that the Village's Type II designation of the water sale agreement was arbitrary and capricious and that the Village had improperly segmented the SEQRA review of the lease from the water sale agreement.

The Appellate Division (115 AD3d 1310 [2014]), unanimously (1) reversed the judgment on the law, (2) granted the Village's and SWEPI's motion, and (3) dismissed the petition as against them on the ground that Marvin lacked standing.  The court agreed with petitioners that "noise falls within the zone of interests sought to be protected by SEQRA" (115 AD3d at 1312).  However, emphasizing that "Marvin raised no complaints concerning noise from the transloading facility itself" (115 AD3d at 1311), the court, citing Society of Plastics, reasoned that "[i]nasmuch as we are dealing with the noise of a train that moves throughout the entire Village, as opposed to the stationary noise of the transloading facility, we conclude that Marvin will not suffer noise impacts 'different in kind or degree from the public at large'" (115 AD3d at 1312-1313).  Having dismissed the petition for lack of standing, the Appellate Division did not reach the merits of the SEQRA challenge.

II.

We held in Society of Plastics that "[i]n land use matters . . . the plaintiff, for standing purposes, must show that it would suffer direct harm, injury that is in some way different from that of the public at large" (77 NY2d at 774). Applying that test in Matter of Save the Pine Bush, Inc. v Common Council of City of Albany (13 NY3d 297 [2009]), this Court held that petitioners, who alleged "repeated, not rare or isolated use" of the Pine Barrens recreation area, had demonstrated standing "by showing that the threatened harm of which petitioners complain will affect them differently from 'the public at large'" (13 NY3d at 305).

The Appellate Division, in concluding that petitioner Marvin lacked standing, applied an overly restrictive analysis of the requirement to show harm "different from that of the public at large," reasoning that because other Village residents also lived along the train line, Marvin did not suffer noise impacts different from his neighbors. We said in Society of Plastics that

> "[t]he doctrine grew out of a recognition that, while directly impacting particular sites, governmental action affecting land use in another sense may aggrieve a much broader community. The location of a gas station may, for example, directly affect its immediate neighbors but indirectly affect traffic patterns, noise levels, air quality and aesthetics throughout a wide area" (77 NY2d at 774-775).

This example is distinctly different from the situation here

where more than one resident is *directly* impacted by the noise created from increased train traffic.  That more than one person may be harmed does not defeat standing, as we found in Save the Pine Bush where we held that the nine individual petitioners who alleged that they lived near the site of the proposed project and "use[d] the Pine Bush for recreation and to study and enjoy the unique habitat found there," have standing (13 NY3d at 305; see generally United States v Students Challenging Regulatory Agency Procedures (SCRAP), 412 US 669, 687-688 [1973]["[W]e have . . . made it clear that standing is not to be denied simply because many people suffer the same injury . . . To deny standing to persons who are in fact injured simply because many others are also injured, would mean that the most injurious and widespread Government actions could be questioned by nobody."]).  The harm that is alleged must be specific to the individuals who allege it, and must be "different in kind or degree from the public at large"(Society of Plastics at 778), but it need not be unique. Here, petitioner Marvin is not alleging an indirect, collateral effect from the increased train noise that will be experienced by the public at large, but rather a particularized harm that may also be inflicted upon others in the community who live near the tracks.

     The number of people who are affected by the challenged action is not dispositive of standing.  This Court recognized in Matter of Association for a Better Long Is., Inc. v New York

State Dept. of Envtl. Conservation (23 NY3d 1 [2014]) that standing rules should not be "heavy-handed," and declared that we are "reluctant to apply [standing] principles in an overly restrictive manner where the result would be to completely shield a particular action from judicial review" (23 NY3d at 6 [internal citation omitted]). Applying the Appellate Division's reasoning, because there are multiple residents who are directly impacted, *no* resident of the Village would have standing to challenge the actions of the Village, notwithstanding that the train noise fell within the zone of interest of SEQRA. That result would effectively insulate the Village's actions from any review and thereby run afoul of our pronouncement that the standing rule should not be so restrictive as to avoid judicial review.

Here, as in Save the Pine Bush, Marvin alleges injuries that are "real and different from the injury most members of the public face" (13 NY3d at 307). Thus, his allegation about train noise caused by the increased train traffic keeping him awake at night, even without any express differentiation between the train noise running along the tracks and the noise from the transloading facility, would be sufficient to confer standing.[4]

---

[4]Although Marvin's affidavit sets forth a generalized complaint of train noise, we see no reason to conclude, as did the Appellate Division, that he is only claiming noise from trains running on the tracks, and not from the trains in the loading facility. Given his proximity to the facility and his allegations, we may conclude that he was hearing noise from the facility, as well as the noise from the trains running along the tracks. Additionally, the verified petition references an

Accordingly, the order should be reversed, with costs, and the matter remitted to the Appellate Division, for consideration of issues raised but not determined on the appeal to that court.

*  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *

Order reversed, with costs, and matter remitted to the Appellate Division, Fourth Department, for consideration of issues raised but not determined on the appeal to that court. Opinion by Judge Abdus-Salaam. Chief Judge Lippman and Judges Pigott, Rivera, Stein and Fahey concur.

Decided November 19, 2015

engineer's report issued prior to the construction of the facility that states that the loaded cars will be heavy, and that moving cars loaded with more than 96 tons of weight on and off sidings can be expected to result in significant noise from coupling and uncoupling cars, running the diesel engines required to move the railcars and squeaking wheels. In sum, Marvin's allegations, read in the context of the petition, sufficiently set forth harm caused not only by the noise of trains running along the tracks, but the trains in the loading facility.