Acker v Village of Head of the Harbor (2025 NY Slip Op 50418(U))

[*1]

Acker v Village of Head of the Harbor

2025 NY Slip Op 50418(U)

Decided on April 2, 2025

Supreme Court, Suffolk County

Liccione, J.

Published by New York State Law Reporting Bureau pursuant to Judiciary Law § 431.

This opinion is uncorrected and will not be published in the printed Official Reports.

Decided on April 2, 2025
Supreme Court, Suffolk County

Natasha Acker; CAROLE LAWLER; TED MAHLER; DEAN JOHNSON; 
 PHIL KOSTS; STACEY KOSTS; and CHARLES MILLER, III, Petitioners,

against
Village of Head of the Harbor; BOARD OF TRUSTEES FOR THE HEAD OF THE HARBOR; and MONASTERY OF THE GLORIOUS ASCENSION, INC., Respondents.

Index No. 609399/2024

PETITIONERS' ATTORNEY
RIVKIN RADLER, LLP
926 RXR Plaza
Uniondale, NY 11556
RESPONDENTS' ATTORNEYS
EGAN & GOLDEN, LLP
Attorneys for Village of Head of the Harbor and Board of Trustees for the Head of the Harbor
96 S. Ocean Avenue
Patchogue, NY 11772
BUZZELL BLANDA & VISCONTI, LLP
Attorneys for Monastery of the Glorious Ascension, Inc.
535 Broadhollow Road, Suite B4
Melville, NY 11747

Maureen T. Liccione, J.

Upon review and consideration of NYSCEF Doc Nos. 1-7, 10-63 and oral argument [*2]conducted on February 24, 2025 the transcript of which is at NYSCEF Doc No. 65, it is hereby:
ORDERED AND ADJUDGED that the petition is dismissed.
This is a special proceeding brought pursuant to CPLR Article 78 by the petitioners (Petitioners), who are individual residents of the Village of Head of the Harbor (Village), against the respondents, the Village of Head of the Harbor (Board of Trustees or Trustees) and the Monastery of the Glorious Ascension, Inc. (Monastery or Monks). Petitioners seek a judgment annulling and declaring void (1) a resolution issuing a negative declaration (Negative Declaration) pursuant to the State Environmental Quality Review Act (SEQRA) and (2) a resolution by the Board of Trustees granting a special permit (Special Permit) for the Monks to construct a small church (Chapel) on its 4.605 acre parcel, both dated March 13, 2024. The petition, supporting exhibits, and notice of petition were filed on April 12, 2024. The Trustees filed the certified record and a verified answer on December 6, 2024, but did not submit a memorandum of law or affidavits/affirmations in opposition. The Monastery also filed its answer on December 6, 2024, together with pages it contended were missing from the certified record, exhibits, a memorandum of law and an attorney affirmation, all opposing the petition. 
Additionally, counsel for all parties made submissions requested by the Court as to potential conflicts of interest. In the course of that correspondence, counsel for the Monastery raised legal issues concerning an exhibit to the petition. 
Facts
The Monastery, an order of monks who are members of the Russian Orthodox Church, owns a 4.605 acre parcel (Property) at 481 North Country Road (Route 25A) in the Village. The Property was purchased by the Monks in 2018. It currently contains a two-story residential structure built in the nineteenth century known as the Timothy House. Timothy House serves as the nine Monks' residence and has limited space for them to pray and conduct services with a small group of lay people who come to pray with them or participate in Sunday services. 
The Monastery is not a parish with regular lay members. The Episcopal Parish Church of Saint James and the Roman Catholic Parish Church of Saints Philip and James are located within a quarter mile of Timothy House. 
According to the Trustees' resolution approving the Special Permit, both Timothy House and the Property are listed on the State and the National Registers of Historic Places. The Property is located in the Residence A zoning district and has been designated by the Town of Smithtown as within the St. James Historic District. There are covenants and restrictions in the Property's deed chain, which are discussed below. 
Over the course of an almost five year period, beginning with their original June 2020 application, the Monks have sought approvals from the Board of Trustees to construct a Chapel on the Property. The Chapel requires a special use pursuant to Village Code § 165-23 (B) (1) and architectural review, both from the Board of Trustees, as well as site plan approval by the Village planning board (Planning Board). According to the Special Permit approval the proposed Chapel would be 3,341 square feet including a basement and porch. At oral argument it was estimated that the Chapel footprint, including the porch, would be approximately 2,000 square feet. 
Pursuant to Village Code § 165-23 (B) (1), "[c]hurches and other places of religious worship" are permitted in the Residence A district by special permit from Board of Trustees provided that they are "located on adequate sites and with adequate provision for parking at times of maximum attendance or use of the premises, with landscaping and controls over [*3]lighting and signs as may be required so as to protect and not adversely affect adjoining properties and with means of ingress and egress which are properly related to the street system." 
Furthermore, the general special permit criteria in Village Code § 165-36, provide that in order to grant a special permit, the Trustees must find that: 
a. the location and size of the use, the nature and intensity of the operations involved in or conducted in connection with it, the size of the site in relation to it and the location of the site with respect to streets giving access to it are such that it will be in harmony with the appropriate and orderly development of the district in which it is located. b. the location, nature and height of buildings, walls and fences and the nature and extent of the landscaping on the site are such that the use will not hinder or discourage the appropriate development and use of adjacent land and buildings. c. Operations in connection with any special use will not be more objectionable to nearby properties than would be the operations of any permitted use not requiring a special permit. d. Parking space will be of adequate size for the particular use, properly located and suitable screened from adjoining residential uses, and the entrance and exit drives will be laid out so as to achieve maximum safety. e. Adequate arrangements for maintenance of the premises, for refuse removal and for sewage disposal will be provided. f. payment of a fee to the Village in an amount to be fixed from time to time by the Village Board. In addition, the Village's regulations concerning the preservation of scenic and historic resources state the following: 
a. Structures shall be located on their sites In a manner which retains views and overlooks, preserves open space and provides visual organization to a site. The overall site topography and vegetative density and character shall be retained and maintained to the maximum extent after site development. b. The mass, shape, color, reflective qualities and texture of materials to be used in a structure shall be a harmonious complement to adjacent properties and the overall site topography and vegetative composition, as viewed from roads, water or the opposite shore. c. Historic structures and landmarks shall be retained, If practicable, as an important component of the visual environment. d. Construction in or adjacent to any historic district shall not present an intrusive or disharmonious element in the historic district.
Village Code §§ 165-61 (B), 165-62 (C), (D) and (E). Finally, the Board of Trustees must consider the criteria for the preservation of historic areas set forth in Village Code Chapter 107, including the two hundred-foot buffer from North Country Road required for new construction along the Route 25A historic corridor. 
As noted above, the Monks filed their first application with the Trustees in June 2020. In accordance with the Village Code, the Trustees referred the application to the Planning Board for [*4]a report and recommendation. At that time, the proposal was for a 3,027 square foot Chapel, with a commercial kitchen, an 885-square foot porch, patios, walkways, and two parking areas with stalls for 43 passenger vehicles. The proposed Chapel building was to be located roughly in the center of the Property and 147.9 feet from Route 25A.
The Planning Board issued a report raising a number of concerns with the proposal. In response, the Monastery revised its plans, which were submitted in November 2022. The new application included, among other things, a much smaller kitchen and a statement by the New York State Office of Parks Recreation and Historic Preservation (OPRHP) that the proposed Chapel, as now relocated on the Property, would not adversely impact the Timothy House or the St. James Historic District. One of the Petitioners who is an adjacent neighbor, Natasha Acker, objected to the location to the Chapel which resulted in a third set of revised plans, and which were presented to the Trustees in February 2024. The new application located the Chapel 350 feet from Ms. Acker's residence, which is further from her residence than the Timothy House, and included dark sky compliant lighting. A fourth application was submitted on March 11, 2024 which relocated the parking area to the back of the Property. 
After several public hearings and their visits to the Property, the Trustees issued a SEQRA Negative Declaration and approved the Special Permit by a 4-1 vote by resolutions dated March 13, 2024. The Special Permit resolution was fourteen pages long and provided detailed findings and conditions. The Negative Declaration was similarly detailed. The Special Permit resolution, among other things, prohibits any subdivision or further development of the Property and bans violations of the deed restrictions. 
The hearing transcripts reveal that the proposed Chapel had supporters and also stirred vigorous opposition. A Village election was held shortly after the Special Permit was issued. Two community members who opposed the Chapel Special Permit were elected to the five member Board of Trustees. The new mayor, Mr. Utevsky, and a new trustee, Ms. Davidson, both opponents to the Chapel, joined the trustee who was the lone no vote on the Special Permit resolution, Ms. Ogden. Together they now form a three person majority opposed to the Chapel. 
The Petition
The verified petition contains no detailed allegations of standing, but merely states that Ms. Acker's residence is immediately adjacent to the Property and that the remaining Petitioners reside in "close proximity" to the Property, without any specifics. It alleges in a conclusory manner that each of them will be harmed by increases in noise and traffic and a change in neighborhood characteristics, without detailing those alleged harms or how they differ from the impacts experienced by the public at large. No affidavits or affirmations by the Petitioners or any experts specifying these alleged impacts are included with the petition. 
The petition also asserts that the Special Permit and Negative Declaration resolutions should be declared void because trustee and then Deputy Mayor Daniel White, who voted in favor of the Special Permit and Negative Declaration, had a prohibited conflict of interest because "he has a family member who is affiliated with the Monastery," but does not specify the degree of consanguinity or the nature of the family member's alleged affiliation (Petition, ¶ 30). It adds a vague contention that Timothy House "was subject to certain recorded restrictions with regard to what could be built or used at the [Property]," but fails to allege how, if at all, the Special Permit or the Negative Declaration violate those unnamed restrictions (Petition ¶ 19). 
The petition alleges that the Board of Trustees' resolution granting the Special Permit, and containing detailed findings and restrictions, did not suffice to meet the special permit [*5]requirements of the Village Code because "there are not adequate streets to allow access to the property, the amount of parking was inadequate, and the use would be more detrimental to the neighboring properties than a use that did not require a Special Permit" (Petition, NYSCEF Doc No 1, ¶ 29). Further, the petition alleges that the Negative Declaration was issued as a result of the Board of Trustees' failure to take the requisite "hard look" at the potential environmental impacts of the proposed Chapel because "there was no analysis as to whether granting the Special Permit would have a negative impact on the surrounding areas [sic] character" (Petition, NYSCEF Doc No 1, ¶ 35). 
Finally, the petition alleges that these resolutions should be declared null and void because the then members of the Board of Trustees' motivation for voting in favor of the Special Permit and Negative Declaration resolutions was an incorrect legal opinion by the former Village attorney, who warned that they might have personal liability if they voted otherwise. The partially redacted portion of that confidential legal memorandum advised that the members of the Board of Trustees could have personal liability under the Federal Religious Land Use and Institutionalized Persons Act (RLUIPA) were they to vote against the Special Permit. The petition contends that because of this legal memorandum the Trustees feared being sued "with their personal assets exposed" and, therefore, voted in favor of the Chapel. The partially redacted confidential attorney/client memorandum is attached as Exhibit 5 (NYSCEF Doc. No. 7) to the petition. 
Applicable Law
The first guiding principle governing this proceeding is the long-established New York law that religious uses of land are presumptively beneficial to the public (Jewish Reconstructionist Synagogue of N. Shore v Incorp. Vill. of Roslyn Harbor, 38 NY2d 283, 289 [1975], cert denied 426 US 950 [1976]; Matter of Westchester Reform Temple v Brown, 22 NY2d 488 [1968]; Matter of Diocese of Rochester v Planning Bd. of Town of Brighton, 1 NY2d 508, 526 [1956]). "So strong is the presumption of public benefit that ordinarily such factors bearing on public health, safety and welfare as neighborhood appearances, adverse effect on property values, loss of tax revenue, decreased enjoyment of neighboring properties and traffic hazards are insufficient to rebut the presumption" (Matter of Diocese of Rochester v Planning Bd. of Town of Brighton, 1 NY2d at 526). "'[W]here an irreconcilable conflict exists between a right to erect a religious structure and the potential hazards of traffic or diminutions in value, the latter must yield to the former'" (Matter of American Friends Socy. of St Pius, Inc. v Schwab, 68 AD2d 646, 650 [2d Dept 1979], quoting Jewish Reconstructionist Synagogue of N. Shore v Incorp. Vill. of Roslyn Harbor, 38 NY2d at 289). "Even where the religious use brings more traffic and congestion than a residential use" every effort must be made to accommodate the religious use through the impositions of conditions (Matter of Apostolic Holiness Church v Zoning Bd. of Appeals of Town of Babylon, 220 AD2d 740 [2d Dept 1995]). "Potential traffic hazards do not justify the exclusion of a proposed religious use" (Matter of Mikveh of S. Shore Congregation v Granito, 78 AD2d 855, 855 [2d Dept 1980]). "Churches occupy a different status from mere commercial enterprises and when the church enters the picture different considerations apply (Matter of Young Israel of N. Woodmere v Town of Hempstead Bd. of Zoning Appeals, 221 AD2d 646, 647 [2d Dept 1995] [internal citations and quotations omitted]). "While religious institutions are not exempt from local zoning laws, greater flexibility is required in evaluating an application for a religious use than an application for another use and every effort to accommodate the religious use must be made" (Matter of Rosenfeld v Zoning Bd. [*6]of the Town of Ramapo, 6 AD3d 450 [2d Dept 2004] [internal citations and quotations omitted]). 
The second guiding principle is that "[u]nder New York law, a special use permit, unlike a variance, authorizes the use of property in a manner expressly permitted by the zoning ordinance under stated conditions" (Matter of North Shore Steak House v Bd. of Appeals of Inc. Vill. of Thomaston, 30 NY2d 238, 243 [1972]; Matter of Twin County Recycling Corp. v Yevoli, 90 NY2d 1000, 1002 [1997]). The significance of this distinction is that the "inclusion of the permitted use in the [zoning] ordinance is tantamount to a legislative finding that the permitted use is in harmony with the general zoning plan and will not adversely affect the neighborhood" (Matter of North Shore Steak House v Bd. of Appeals of Inc. Vill of Thomaston, 30 NY2d at 243; Matter of Twin County Recycling Corp. v Yevoli, 90 NY2d at 1002]). Thus, the burden of proof on an owner seeking a special use permit is lighter than on an owner seeking a variance (id.). 
"[T]he issuance of a special permit is a duty which must be exercised whenever there is compliance with the statutory conditions" (Matter of Peter Pan Games of Bayside v Bd. of Estimate of City of NY, 67 AD2d 925, 926 [2d Dept 1979]). [T]he denial of a special use permit "solely because there is a general objection to the special use" is arbitrary (Matter of Tandem Holding Corp. v Bd. of Zoning Appeals of Town of Hempstead, 43 NY2d 801 [1977]). "Where ... supporting evidence exists, deference must be given to the discretion of the board, and a court may not substitute its own judgment for that of the board, even if such a contrary determination is itself supported by the record" (Matter of 153 Mulford Assoc., LLC v Zoning Bd. of Appeals of the Town of E. Hampton, 205 AD3d 1019, 1023 [2d Dept 2022] [internal citations and quotation marks omitted]). 
The third principle is the rule that a special permit application cannot be denied based on generalized community opposition (Matter of Chestnut Petroleum Dist., Inc. v Town of Mt. Pleasant Planning Bd., 222 AD3d 748 [2d Dept 2023]; (Matter of Twin County Recycling Corp. v Yevoli, 90 NY2d 1000 [1997]; Matter of Framike Realty Corp. v Hinck, 220 AD2d 501 [2d Dept 1995] [impermissible to deny a special permit "solely on the basis of generalized objections and concerns of the neighboring or adjoining community expressed by members thereof, which, in effect, amount to 'community pressure'"]).
The final principle is the long recognized maxim that judicial review of a determination granting or denying "an application for a special use permit is limited to ascertaining whether the [determination] was illegal, arbitrary and capricious, or an abuse of discretion" (Matter of Marcus v Planning Bd. of the Vill. of Wesley Hills, 199 AD3d 1007, 1008 [2d Dept 2021] [citations omitted]). "Where ... supporting evidence exists, deference must be given to the discretion of the board, and a court may not substitute its own judgment for that of the board, even if such a contrary determination is itself supported by the record" (Matter of 153 Mulford Assoc., LLC v Zoning Bd. of Appeals of Town of E. Hampton, 205 AD3d at 1023 [2d Dept 2022] [internal citations and quotations omitted]; see Matter of QuickChek Corp. v Town of Islip, 166 AD3d 982, 983 [2d Dept 2018]. 
It is against this general backdrop that the petition is considered. The specific allegations in the petition are considered below seriatim. 
Standing
In a CPLR Article 78 proceeding the petitioners have the burden to establish standing (Matter of Crown Castle NG E., LLC v City of Rye, 207 AD3d 624, 626 [2d Dept 2022], quoting Matter of Association for a Better Long Is., Inc. v New York State Dept. of Envtl. Conservation, [*7]23 NY3d 1 [2014]). Standing involves an inquiry into whether that litigant has a "sufficiently cognizable stake in the outcome so as to cast the dispute in a form traditionally capable of judicial resolution" (Community Bd. 7 of Borough of Manhattan v Schaffer, 84 NY2d 148 [1994]). In land use matters, a party challenging governmental action has standing if it (1) shows that it would suffer direct harm or injury-in-fact that is in some way different from that of the public at large, and (2) that the claimed harm is within the zone of interests protected by the statute or statutes alleged to have been violated (id.). "The harm that is alleged must be specific to the individuals who allege it and must be different in kind or degree from the public at large, but it need not be unique" (Matter of Sierra Club v Vill. of Painted Post, 26 NY3d 301, 311 [2015] [internal citations and quotations omitted]). 
"An allegation of close proximity alone may give rise to an inference of damage or injury" that enables a nearby property owner to challenge a land use decision without proof of actual injury (Matter of Sun—Brite Car Wash v Bd of Zoning & Appeals of Town of N. Hempstead, 69 NY2d 406 [1987]). "The status of neighbor does not, however, automatically provide the entitlement, or admission ticket, to judicial review in every instance. Petitioner, for example, may be so far from the subject property that the effect of the proposed change is no different from that suffered by the public generally" (id. At 414). "[A]n inference of direct harm may arise from the petitioner's proximity to the property that is the subject of the administrative action: the closer the petitioner, the stronger the inference" (Matter of Panevan Corp. v Town of Greenburgh, 144 AD3d 806, 807 [2d Dept 2016]). Generally, the relevant distance is the distance between the petitioner's property and the actual structure or development itself, not the distance between the petitioner's property and the property line of the site (Matter of Figueroa v Town of Wallkill, 232 AD3d 729 [2d Dept 2024]; (Matter of Tuxedo Land Tr., Inc. v Town Bd. of Town of Tuxedo, 112 AD3d 726, 728 [2d Dept 2013]).
Here, the petition contains no specific allegations as to any of the Petitioners' distance from the Chapel. It merely alleges that six of the Petitioners (Lawler, Mahler, Johnson, the Kosts and Miller) reside nearby and that one resides on an adjacent parcel (Acker) (see e.g. Vill. of Head of the Harbor v Town of Smithtown, Sup. Ct, Suffolk County Index No. 608051/2022, Petition, NYSCEF Doc No. 1 [specific distances of each petitioners' property from the proposed structures alleged in the petition]; Matter of Barrett v Dutchess County Legislature, 38 AD3d 651 [2d Dept 2007]; Matter of Green Earth Farms Rockland, LLC v Town of Haverstraw Planning Bd., 153 AD3d 823 [3d Dept 2017] [allegations that properties were within 500 feet of project bestowed standing while allegations of others to be 2,000 feet away did not]; Matter of Oates v Vill. of Watkins Glen, 290 AD2d 758 [3d Dept 2002] [petitioner who alleged her residential property separated from proposed Walmart by 530 feet but was at least seven residential lots and a set of railroad tracks held not to have standing]. Accordingly, without allegations in the petition of the distances of the Lawler, Mahler, Johnson, Kosts and Miller residences from the Chapel or alleged harms different from those of the public at large, the Petition failed to plead facts sufficient to meet their burden to establish standing. 
While the petition failed to state facts sufficient for the standing of these six Petitioners, the petition did allege that Ms. Acker's residence adjoins the Monks'. Since "standing rules should not be 'heavy-handed' and 'applied in an overly restrictive manner where the result would be to completely shield a particular action from judicial review'" (Matter of Sierra Club v Vill. of Painted Post, 26 NY3d at 311, quoting Matter of Association for a Better Long Is., Inc. v New York State Dept. of Envtl. Conservation, 23 NY3d 1 [2014]), Ms. Acker is considered to [*8]have standing. Accordingly, the balance of the petition is considered. However, the claims of the remaining six Petitioners are dismissed for lack of sufficient allegations as to their standing. 
Alleged Conflict of Interest and Recusal Requirement
As noted above, the petition alleges that Daniel White was required to have recused himself from voting on the Negative Declaration and Special Permit resolutions because he has an unspecified relative who has an affiliation with the Monastery. Mr. White responded to these assertions by noting that the relative in question is a grandson of one of his aunts with whom he had not had communications of any substance in 20 years. Based on these facts Mr. White indicated that he had no legal requirement to recuse and pronounced that he could be fair and unbiased when casting his votes. 
General Municipal Law (GML) § 809 (2) designates municipal officials' prohibited interests when considering land use applications as follows: 
2. For the purpose of this section an officer or employee shall be deemed to have an interest in the application [for land use approval] when he, his spouse, or their brothers, sisters, parents, children, grandchildren, or the spouse of any of them (a) is the applicant, or (b) is an officer, director, partner or employee of the applicant, or (c) legally or beneficially owns or controls stock of a corporate applicant or is amember of a partnership or association applicant. GML § 800 and § 24-2 of the Head of the Harbor Village Code define "interest" as a "direct or indirect pecuniary or material benefit." Here, an aunt's grandchild does not fall within the ambit of the GML prohibitions regarding family members. The petition contains no allegation of any benefit accruing to Mr. White from his favorable vote. Moreover, there was no manifestation of bias on the part of Mr. White in any of the proceedings (Matter of Schweichler v Vill. of Caledonia, 45 AD3d 1281 [4th Dept 2007], lv to app denied 10 NY3d 703 [2008]); Matter of Ahearn v Zoning Bd. of Appeals of Town of Shawangunk, 158 AD2d 801 [3d Dept 1990]; (see Town of N. Hempstead v Vill. of North Hills, 38 NY2d 334 [1975]. Petitioners cite to no statute, case law or opinion which considers this distant degree of consanguinity to be a conflict in land use matters. The Court has found none. Accordingly, the claim that the Special Permit and Negative Declaration resolutions are void because Mr. White should have recused himself due to a prohibited conflict of interest is dismissed because it is entirely baseless.
Deed Covenants
While as noted above the petition inadequately pleads alleged violations of "certain recorded restrictions with regard to what could be built or used at the [Property]," the Board of Trustees' resolution granting the Special Permit took into careful consideration the deed covenants and restrictions imposed by a prior owner of the property, Mrs. Van Liew (Van Liew Covenants) and made detailed finding confirming that the Chapel would not violate them. The Trustees noted that the Van Liew Covenants, as recorded in 1997, expressly stated that they "impose no legal obligation upon the Village or Its (sic) boards to enforce them." (NYSCEF Doc No. 16).
Further, the Special Permit resolution found that the opponents' argument that the Van Liew Covenants impose an absolute prohibition against a structure being located in the open space between the Timothy House and North Country Road (Route 25 A) was inconsistent with the plain text, as it cited in the resolution (NYSCEF Doc No. 16): 
WHEREAS the Grantor and the Grantee wish to preserve the environment in which the [*9]historic structure on the property now exists so as to realize its great educational and cultural value, and wish to prevent any unsightly developments that will tend to mar or to detract from such environment which would materially affect the historic value of said structure or of historic North Country Road, by altering its surroundings... The House shall be maintained and preserved in its present state as nearly as practicable, though structural changes, alterations, additions, or Improvements as would not In (sic) the opinion of the Grantee or Its (sic) agents fundamentally alter the historic character of the House and the open space character of the Property, may be made thereto by the owner, provided that the prior written approval of Grantee or its agents to such alteration, addition, or improvement shall have been obtained. The open space and natural character of the Property shall be maintained as a landscaped environment so as to enhance the setting of the House as a historic landmark, but nothing herein contained shall prohibit the parking, In (sic) designated part of the premises approved by the Grantee or its agents, of registered operating motor vehicles in use by the owner or occupants of or visitors to the Property. No activities shall be carried on the Property which would destroy or impair the historic and open space value of the Property. Accordingly, the Van Liew Covenants contain no prohibition against development of the Property. As a result, the Board of Trustees' resolution approving the Special Permit stated: 
[t]aking into account the Van Liew Covenants, the Applicant's plans, Input (sic) from Village consultants and residents, the response from the New York Office of Parks, Recreation and Historic Preservation, and the conditions of approval set forth herein, the Board finds that the proposed Church will not violate the Van Liew Covenants. (NYSCEF Doc No. 16).
In making this finding, the Trustees noted the Monks' repeated revisions of their plans to satisfy the Board of Trustees', the Planning Board's, and Ms. Acker's concerns. These included moving the Chapel and its access further from Ms. Acker's residence, assurance that her driveway, which is an easement over the Monks' Property, will be blocked for visitors to the Chapel, the 200 foot buffer from Route 25A, parking shielded from view from Route 25A and adjoining properties, and dark sky compliant lighting. Given that the Chapel will have approximately a 2,000 square foot footprint on a 4.605 acre parcel, as well as the provisions in the Special Permit resolution requiring, among other things, preservation of the Timothy House, the Board of Trustee did not abuse its discretion by finding that the Van Liew Covenants would not be violated by a Special Permit for the Chapel. Petitioners' claims to the contrary, therefore, are dismissed. 
Negative Declaration Resolution
The petition contains conclusory allegations that the Negative Declaration did not adequately address the Chapel's impact on community character, traffic and noise and that, therefore, its issuance was an "error of law" (Petition, NYSCEF Doc No 1, ¶ 37). 
With regard to community character, the six page SEQRA Negative Declaration concluded that the Chapel was consistent with the community's character citing the fact that such a use is expressly permitted in the Residential A zone by special permit. Further, the Negative Declaration noted that the character and quality of the Village's important historical and aesthetic resources were mitigated by the revised plans and other efforts by the Monks as noted above, [*10]and by the conservation of sugar maples and existing vegetation. Given that all structures would cover only 4.06% of the 4.605 acre Property, the Negative Declaration concluded that the impact on open space would not be significant. 
With respect to traffic, the Negative Declaration pointed to an expert traffic study prepared for the application and vetted by the Village's experts. That study concluded that even by conservative estimates the Chapel "add[s] a negligible amount of traffic to the existing road network" (Negative Declaration Resolution, NYSCEF Doc No 17, p 2). Notably, the Petitioners did not submit any traffic expert opinion and certainly none with a contrary conclusion. 
Regarding noise, the Negative Declaration noted that outdoor religious services and sound systems are to be banned and noted that the two existing churches across the street do not generate unacceptable noise. The Petitioners submitted no countervailing information. 
"Judicial review of an agency determination under SEQRA is limited to 'whether the agency identified the relevant areas of environmental concern, took a 'hard look' at them, and made a 'reasoned elaboration' of the basis for its determination'" (Matter of Riverkeeper, Inc. v Plan. Bd. of Town of Southeast, 9 NY3d 219, 231—32 [2007], quoting Matter of Jackson v New York State Urban Dev. Corp., 67 NY2d 400, 417 [1986]). "[I]t is not the role of the courts to weigh the desirability of any action or choose among alternatives, but to assure that the agency itself has satisfied SEQRA, procedurally and substantively" (Matter of Jackson v New York State Urban Dev. Corp., 67 NY2d , at 416). "[T]he 'hard look' standard [of review] does not authorize court to conduct a detailed de novo analysis of every environmental impact of, or alternative to, proposed project, which was included in, or omitted from, a [final environmental impact statement]" (Aldrich v Pattison, 107 AD2d 258, 267 [2d Dept 1985]). 
Accordingly, the Board of Trustees did not commit an error of law by issuing the Negative Declaration resolution. Petitioner's claims in this regard are dismissed. 
The Special Permit Resolution
The petition alleges that the Board of Trustees "failed to exercise their discretion to determine the Special Permit met the requirements of the Village Code" such that the Special Permit resolution was issued in "error or law" (Petition, NYSCEF Doc No 1, ¶¶ 1, 36). Contrary to Petitioners' assertions, the Special Permit resolution analyzed every provision of Village Code § 165-36 and found the application and the conditions it imposed to be compliant with that section of the Code. The resolution recited the following with respect to the requirements of § 165-36: 
a) The location and size of the proposed Church, the nature and intensity of the operations Involved in and conducted In connection with it, the size of the site In relation to It and the location of the site with respect to streets giving access to it are such that the project will be in harmony with the appropriate and orderly development of the Residence "A" District; b) The location, nature and height of the proposed Church, walls and fences and the nature and extent of the landscaping on the site are such that the use will not hinder or discourage the appropriate development and use of adjacent land and buildings; c) Operations in connection with the proposed Church will not be more objectionable to nearby properties than would be the operations of any permitted use not requiring a special permit. As stated above, the proposed Church use is presumptively compatible with the surrounding Residence "A" District. There is no credible evidence before the Board to suggest that its operations will be more objectionable than the as of right uses in [*11]the district, which include government facilities and public parks; d) Parking space will be of adequate size for the proposed Church use, properly located and suitable screened from adjoining residential uses, and the entrance and exit drives will be laid out so as to achieve maximum safety, as indicated in the traffic studies; e) Adequate arrangements for maintenance of the premises, for refuse removal and for sewage disposal will be provided. The Applicant will be required to make necessary arrangements for refuse removal and may be ordered to install a dumpster and enclosure, if the Village Building Inspector finds one necessary. Per the Site Plan, sewage generated by the Church will be treated and disposed of through a new onsite sanitary system, which the Board finds to be acceptable; and f) The Monastery paid the applicable filing fee for a special permit. 

 (NYSCEF Doc. No. 16).

Further, in accordance with Village Code §§ 165-61 and 165-62, the Board of Trustees found:
a) the structures shall be located on their sites in a manner which retains views and overlooks, preserves open space and provides visual organization to a site. The overall site topography and vegetative density and character shall be retained and maintained to the maximum extent after site development. b) The mass, shape, color, reflective qualities and texture of materials to be used in a structure shall be a harmonious complement to adjacent properties and the overall site topography and vegetative composition, as viewed from roads, water or the opposite shore.
c) historic structures and landmarks shall be retained, If practicable, as an Important component of the visual environment. The Timothy House is not included as part of this application and will continue to be maintained in accordance with the Van Liew Covenants. d) Construction In or adjacent to any historic district shall not present an Intrusive or disharmonious element in the historic district. (NYSCEF Doc. No. 16)
Finally, in accordance with Village Code, Chapter 107, the Board of Trustees found: 
1. The proposed changes shall not create a depreciation of the adjacent historic structures, especially the Timothy House; 2. The proposed changes shall not be inconsistent with the general appearance of the area; 3. The bulk and location of the buildings must be appropriate to maintain the character of the area. The size and location of the proposed Church are consistent with the open space character of the Property and the rural character of the North Country Road (Route 25A) corridor and provide for a 200 foot buffer. (NYSCEF Doc No. 16)
Village Attorney Confidential Memorandum
Finally, the confidential legal memorandum of the prior Village Attorney is attached as an exhibit (Exhibit 5, NYSCEF Doc No. 7) to the petition and is offered for the assertion that [*12]absent this memorandum the Trustees would have not issued a negative declaration, would have made different findings, and would have denied the Special Permit. Notably, however, none of the Petitioners was a trustee at the time of the voting. There is no affidavit or affirmation in the record by the trustees who voted to adopt the resolutions, and none attesting to their motivation. The Petitioners have no basis to allege what was within the Trustees' minds and, therefore, the memorandum has no probative value whatsoever. It is therefore not relevant and will be disregarded (see People v Scarola, 71 NY2d 769, 777 [1988] ["Evidence is relevant only if it has any tendency in reason to prove the existence of any material fact"]).
However, there are additional, and more compelling, reasons for the Court to disregard this memorandum. 
By way of background, counsel for Petitioners in the instant matter represented the Village and other petitioners in the Matter of Inc. Vill. of Head of the Harbor v Town of Smithtown, Index No. 608051/2022, which involved challenges to a proposed development in an area of the Town of Smithtown bordering the Village (Smithtown Case). The other petitioners included Trustee Judith Ogden in her personal capacity and the St. James-Head of the Harbor Neighborhood Preservation Coalition, Inc. (Coalition). Judith Ogden is the president of the Coalition (Smithtown Case, NYSCEF Doc No. 69).
By decision, order and judgment of this Court dated February 6, 2024 (NYSCEF Doc No. 85), the Village was dismissed from the Smithtown Case for lack of capacity. However, counsel continued to represent the remaining petitioners in the Smithtown Case, including Trustee Ogden in her personal capacity, as well as the Coalition. Thereafter, the petition was dismissed on the merits (Matter of Inc. Vill. of Head of the Harbor v Town of Smithtown, 84 Misc 3d 1220 (A) [Sup Ct, Suffolk County 2024]). However, counsel continues to represent Ms. Ogden and the Coalition in the appeal of the dismissal of the Smithtown Case (Appellate Division, Second Department No. 2024-12286).
The Special Permit resolution herein was adopted on March 13, 2024 (with Ms. Ogden's the sole "no" vote), about five weeks after the Village was dismissed from the Smithtown Case. Petitioner's counsel commenced this proceeding on April 12, 2024, two months after the Village was dismissed from the Smithtown Case and while Ms. Ogden and the Coalition remained clients.
At oral argument, Petitioners' counsel indicated that Exhibit 5 had been given to him by a member of the Coalition, and that it has since been widely circulated throughout the Village. When asked whether the attorney/client privilege had been waived, he indicated that he knew of no Trustee vote so doing. There is no record of such a vote before the Court.
At oral argument counsel indicated that he had called current Mayor Utevsky (who ran as an opponent of the Chapel) who approved the use of Exhibit 5 in this proceeding for purposes of suing him and the other Trustees. There was no indication that counsel had been given, or even sought, permission from the Village Attorney to speak directly with Mayor Utevsky about the use of Exhibit 5 to sue the Village.
The Village Attorney confirmed during oral argument that he also knew of no Trustee resolution waiving the attorney/client privilege. Without such a vote, Mayor Utevsky had no authority to waive the attorney client privilege for the Board (see e.g. Dour v Vill. of Port Jefferson, 89 Misc 2d 146, 152 [Sup. Ct., Suffolk County 1976]).
The confidential memorandum at Exhibit 5 had to have been given by a Trustee or former Trustee to the Coalition member who then provided it to counsel for the Petitioners. [*13]Apart from the breach of attorney/client confidentiality, the release of Exhibit 5 violated GML § 805 (a) which prohibits a municipal official from "disclos[ing] confidential information acquired by him in the course of his official duties or use such information to further his personal interests." GML § 805 (a) is not waivable. Notwithstanding the unambiguous GML prohibition, this confidential information, which was released in violation of law, was appended as Exhibit 5 to the petition. For these additional reasons Exhibit 5 is disregarded.
Conclusion
Given the insufficiently pled petition, the long-standing protection of religious land uses in New York law, the legal principles which govern special permit applications, the exhaustive findings in the Special Permit and Negative Declaration resolutions, the entirely baseless conflict of interest allegations against Mr. White, and the unlawful release of confidential attorney/client communication protected from disclosure under the GML, the petition is dismissed. This legally insufficient proceeding should not further delay the Monks' application to build a small Chapel on their Property.
The foregoing constitutes the decision, order and judgment of the Court.
ENTER
DATE: April 2, 2025
Riverhead, NY
HON. MAUREEN T. LICCIONE, J.S.C.